IN THE UNITED STATES COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMAG PHARMACEUTICALS, INC.,<br><br>   Plaintiff,<br><br>v.<br><br>AMERICAN GUARANTEE AND<br>LIABILITY INSURANCE COMPANY,<br><br>   Defendant. | Case No. _____ |

## COMPLAINT AND JURY DEMAND

Plaintiff, AMAG Pharmaceuticals, Inc. (hereafter "AMAG," "Policyholder" or "Insured"), by and through its attorneys, Proskauer Rose LLP, for its Complaint for declaratory judgment pursuant to 28 U.S.C. § 2201(a) and breach of contract against American Guarantee and Liability Insurance Company (hereafter "Insurer" or "Zurich"), allege and state as follows:

## INTRODUCTION

1. This action arises from Zurich's wrongful denial of insurance coverage under a broad all-risk insurance policy (the "Policy") covering, among other business interruption losses, AMAG's loss of gross earnings, expenses to reduce loss, and extra expense incurred as a result of AMAG's slowdown of its business activities resulting from direct physical loss or damage to property of a supplier, commonly known as "Contingent Business Interruption" coverage. Plaintiff suffered this precise type of loss for which it purchased the Policy when a key supplier was unable to deliver much needed product. Specifically, beginning in November 2017, AMAG's direct supplier, ████, suffered physical loss or damage to its property at its ████████ plant, a covered dependent property under the Policy. Such loss or damage to supplier's property

in turn resulted in ▓▓▓ non-delivery of essential product causing Plaintiff tens of millions of dollars of covered loss. Defendant initially purported to reserve its rights under the Policy and ultimately improperly denied coverage to the Insured. AMAG seeks damages for Zurich's breach of contract and for a declaratory judgment as to the parties' rights and obligations under the Policy.

## BACKGROUND

2. AMAG, a small pharmaceutical company based in Waltham, Massachusetts, was founded in 1981. Among its leading products was ▓▓▓ an injectable drug indicated to  .

3. Beginning in 2009, AMAG began working with ▓▓▓ ("▓▓▓" or "Supplier") on the ▓▓▓® product, which gained FDA approval in ▓▓▓ ▓▓▓ In relevant years, ▓▓▓ was AMAG's sole or primary supplier.

4. During relevant times, Supplier provided ▓▓▓ to AMAG utilizing a clean room at Supplier's ▓▓▓ facility known as the ▓ line or ▓ filling area. In order to supply ▓▓▓ to AMAG, ▓▓▓ added liquid to the powdered Active Pharmaceutical Ingredient (or "API"), filled vials with the resulting mixture, and shipped to third-parties for labeling and packaging. AMAG sold both branded ▓▓▓ and, later, an authorized generic version.

5. ▓▓▓ was AMAG's largest product, with net sales of approximately $▓ million in 2016 and $▓ million in 2017.

6. In November 2017, during the Policy period, Supplier's ▓ filling area suffered physical loss or damage resulting in ▓▓▓'s non-delivery of four lots—nearly 200,000 1mL

vials—of ▓▓▓▓ to plaintiff.  These four lots were never delivered nor replaced.  AMAG was thus unable to fulfil its contracts and make sales of ▓▓▓▓.

7. Despite Plaintiff's Herculean efforts, this supply disruption led to tens of millions of dollars of losses and ultimately forced AMAG's exit from the ▓▓▓▓▓▓▓▓▓▓▓▓ market.

8. Plaintiff timely noticed Zurich of the loss.  AMAG also pursued other recovery from ▓▓▓ resulting in a confidential settlement.  Defendant has denied coverage.  Plaintiff seeks coverage here under the Policy for Contingent Business coverage that is not subject to the ▓▓▓ settlement.

## THE PARTIES

9. Plaintiff AMAG Pharmaceuticals, Inc. is Delaware corporation with its principal place of business in Waltham, Massachusetts and is insured under the Policy.

10. Defendant American Guarantee and Liability Insurance Company is an insurance company domiciled in New York with its principal place of business in Schaumburg, Illinois. American Guarantee and Liability Insurance Company is a member of the Zurich Insurance Companies and issued the "Zurich Edge" Policy to the Plaintiff.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendant and the amount at issue exceeds the $75,000.

12. This Court has personal jurisdiction pursuant to Fed. R. Civ. P. 4(e); M.G.L. c. 233A, § 3; and M.G.L. c. 175, § 151 because, at all relevant times, Defendant was registered with the Massachusetts Department of Insurance to transact insurance business within the Commonwealth of Massachusetts, and Defendant has transacted insurance business within the

Commonwealth. Jurisdiction is additionally proper, because an actual controversy exists between the Insured and Zurich regarding the parties' rights and obligations under the insurance policy at issue, which was issued to Plaintiff in Massachusetts.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is licensed and does business in the Commonwealth, Plaintiff's place of business is in this District, and the Policy at issue was issued to the Insured in Waltham, Massachusetts.

## NATURE OF THE ACTION

14. This civil action for declaratory judgment and breach of contract arises out of Zurich's wrongful failure and refusal to honor its obligation to provide AMAG with coverage under a commercial property and business interruption insurance policy for the substantial losses of business income, extra expense, and related losses incurred by AMAG arising out of "direct physical loss of or damage" to Supplier's property resulting in the necessary slowdown of AMAG's business. Zurich's chosen Policy language covers either "direct physical loss of **_or_** damage" to a supplier's "property (of the type *insurable* under this Policy)" "from *any* cause unless excluded)" (emphasis added). As a result of loss or damage to ▓▓▓ property in the ▓ filing area, AMAG experienced an extreme slowdown (a "Suspension" as defined in the Policy) in its business activities, ultimately suffering tens of millions of dollars of insured loss.

15. AMAG, a small but profitable pharmaceutical company, has always faced the risk that a key supplier would be unable to deliver essential product, thus severely damaging AMAG's business. Plaintiff took steps to protect against such risks by purchasing all-risk insurance from Zurich.

16. The Insured purchased a broad commercial property insurance policy from Zurich for the annual period beginning February 1, 2017, paying a premium of more than $425,000 for

4

the 12-month policy period. The Policy covers not only repair or replacement of AMAG's own property due to loss or damage, but also covers the Insured's loss of business income and extra expense incurred by the Insured due to physical loss of or damage to a *supplier's or contract manufacturer's* property, often referred to as "contingent business interruption" coverage in the insurance industry. The Policy AMAG purchased from Zurich is an "all-risk" policy. Such policies protect against all risks of loss or damage except those explicitly and unambiguously excluded from coverage.

17. Beginning in November 2017, the Insured began to experience precisely the type of losses for which it had purchased coverage as a result of a key supplier's non-delivery of ▮▮▮▮ due to damage to the Supplier's property at a covered dependent location. The Insured suffered tens of millions of dollars in covered losses and costs occasioned by the interruption of its business. The Insured reasonably expected it could turn to Zurich to provide the coverage for which it had contracted.

18. Instead, Zurich wrongly denied coverage to the Insured, taking the position that the facts did not trigger the Policy's contingent business interruption coverage or that one or more exclusions applied.

19. The Insured seeks to hold Zurich responsible for its wrongful breach of the Policy contract, as well as obtaining declarations that Zurich must provide the Insured with the coverage promised and for which the Insured paid premium.

## FACTUAL ALLEGATIONS

### The Zurich Policy

20. Defendant issued "The Zurich EDGE Policy" No. ERP0088480-02 to the Insured for the policy period of February 1, 2017 to February 1, 2018 (the "Policy"). A true and correct

copy of the Policy is attached as **Exhibit A**.  The Policy provides up to $265,000,000 in coverage "for the total of all coverages combined" and specifically includes up to $50,000,000 for contingent business interruption loss at ████████████████████████ location (*see* Ex. A, Policy App'x F, Loc. No. 1).

21.     The Insured timely paid all premiums due for the Policy, totaling $427,445.60, and Zurich accepted them.  Accordingly, the Insured reasonably expected the coverage purchased would be provided.

22.     Zurich drafted the Policy.

23.     AMAG is the First Named Insured under the Policy.

24.     The Policy provides coverage for property damage, business interruption (referred to in the Policy as "Time Element") and contingent business interruption, among other covered causes and types of loss.  Specifically, the Policy "[i]nsures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location[.]"  Ex. A, Policy § 1.01.  A **Covered Cause of Loss** is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."  Ex. A, Policy § 7.11.  Covered Property includes the Insured's interest in real and personal property.  Ex. A, Policy § 3.01.01.

25.     The Policy's Time Element Coverages Form provides in pertinent part:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location.  The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**, or as provided in Off Premises Storage for Property Under Construction Coverages.
>
> The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations.  Such other Location must depend on the

continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

Ex. A, Policy, § 4.01.01.

26. The Policy's "Special Coverages" include Contingent Time Element:

This Policy covers the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations,** and **Attraction Properties** located worldwide, except [certain non-U.S. countries]

Ex. A, Policy, § 5.02.05.

27. "**Suspension**" is defined by Zurich in the Policy as "the slowdown or cessation of the Insured's business activities;" "**Covered Cause of Loss**" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded;" and "**Direct Dependent Time Element Locations**" include any location of "a direct: customer, supplier, contract manufacturer or contract service provider to the Insured."  Ex. A, Policy §§ 7.11, 7.16, 7.56.

28. The Time Element Coverages, including contingent business interruption, provide coverage for AMAG's loss of "Gross Earnings," which is defined as "the actual loss sustained by the Insured during the period of liability."  Ex. A, Policy § 4.02.01.01.  Pursuant to the Policy Declarations, this coverage is initially provided for 24 months.

29. The Time Element Coverages provide coverage for an Extended Period of Liability, which extends the Gross Earnings coverage for an additional 365 days under the Policy Declarations.  Ex. A, Policy § 4.02.02.

30. The Time Element Coverages also provide up to $25 million in "Extra Expense" coverage "for the reasonable and necessary Extra Expenses incurred by the Insured, during the

Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**." Ex. A, Policy § 4.02.03.

31.     Additionally, the Policy provides coverage for expense to reduce loss and professional fees.

32.     As set forth below, the Policy contains a number of exclusions raised by Zurich, each of which is inapplicable and must be construed strictly against Zurich and in favor of coverage.

## Physical Loss or Damage to ▮▮▮ Property

33.     As set forth above, AMAG's ▮▮▮ product was mixed, filled, and stoppered on ▮▮▮ ▮ line. The ▮ line was also used for other products and contained two paths, one for "lyophized" and the other for non-lyophized (liquid fill) products. ▮▮▮ vials were filled using the non-lyophized path.

34.     On or about November 10, 2017, ▮▮▮ was alerted by the triggering of environmental alarms of an air hose connection that had come loose on a piece of equipment (called a "trayer") on the lyophized filling path. The cause of the air hose becoming disconnected was determined to be a result of maintenance that ▮▮▮ had conducted on the trayer the day before. While that connection was repaired on or about November 12, it was subsequently determined that the air line that powers the trayer rake arms came loose and propelled compressed air into the area under the trayer. ▮▮▮ collected samples on or about November 11 and 13, and December 9, ultimately stating that mold was or could have been at various parts of the ▮ line and shutting down the entire ▮ line on December 8.

35. The mold under the trayer only became mobile as a result of the November 10 air leak. Following tests, Supplier determined the mold was potentially harmful to humans. Due to the physical loss or damage to ▆▆ equipment, ▆▆ ultimately rejected all lots passing through both paths of the ▆ line between November 9 and December 8, including AMAG's four lots of ▆▆ filled on November 17 and 25, and December 2 and 7 (the "Four Lots"). The Four Lots consisted of 192,693 ▆ vials.

### The Non-Delivery of AMAG's Four Lots Causes Slowdown of AMAG's Business Operations

36. The Four Lots were never delivered or replaced by ▆, resulting in more than $30 million net revenue loss to Plaintiff plus other covered losses. AMAG struggled mightily to keep the business afloat and mitigate its losses, but could not make sales without product. Ultimately, AMAG exited the profitable ▆▆▆ market.

37. Plaintiff suffered significant losses covered by the Policy, including: ▆▆ stock on hand was used to partially fulfil AMAG's authorized generic contracts, thus losing more profitable branded sales; AMAG incurred increased costs to procure saleable ▆ vials of ▆▆ from another source; mitigation costs were incurred in switching patients in need of ▆▆ from ▆ to ▆ vials, and loss of API in the Four Lots never delivered by ▆.

38. In August 2019, AMAG instituted arbitration against ▆ under the parties' supply contract for damages resulting from Supplier's alleged numerous breaches of contract, only some of which related to the Four Lots. The ▆ arbitration resulted in a confidential settlement. AMAG does not seek in this suit any amounts recovered from ▆ in settlement. Rather, Plaintiff's claim to Zurich is for AMAG's time element loss, extra expense, expenses to reduce loss, and professional fees resulting from loss or damage to ▆ property.

**Zurich's Denial of Coverage**

39. On or about June 6, 2018, the Insured provided Zurich with notice under the Policy.

40. Zurich acknowledged receipt of the Claim and assigned the Claim number 5630021385.

41. AMAG and Zurich communicated by phone, letter and email about the Insured's losses and the status of the ▮▮▮ arbitration. At various times, Zurich took differing positions: denying coverage in September 2018; "reopen[ing the claim] for investigation" on December 20, 2018 and January 5, 2019; withdrawing its denial while purporting to reserve its rights by correspondence dated June 12, 2019; and eventually returning to a compete denial of coverage in 2021.

42. On January 15, 2021 and again on March 30, 2021, Zurich notified AMAG that it had concluded the Policy did not provide coverage and that it was denying the Claim.

**AMAG's Claim Triggers the "All Risks"
Zurich Policy and Various Coverages Therein**

43. The physical loss or damage to Supplier's equipment, by a cause of loss not expressly excluded, at or near the ▮▮▮ line occurred during the Zurich policy period and resulted in non-delivery of the Four Lots. This in turn caused a slowdown of AMAG's business and all time element and related loss is covered by the Policy.

    *i.*    *Loss or Damage to ▮▮▮'s Property Triggers the Policy's Contingent Business Interruption Time Element Coverages*

44. As quoted above, Zurich's contingent business interruption section 5.02.05 covers (a) AMAG's time element loss, (b) resulting from suspension of AMAG's business, (c) resulting from physical loss or damage by a covered cause of loss (d) to property of the type insurable, (e)

at a direct dependent time element location. Each of these elements are fulfilled as described herein and in paragraphs 45-49 below.

45. AMAG suffered loss of gross earnings, expenses to reduce loss, and extra expense, including lost sales, mitigation and "cover" costs, and sales of less profitable authorized generic product.

46. AMAG's time element losses were a result of a suspension (defined in the Policy to include a "slowdown of business activities") of AMAG's ▮▮▮ sales and no other causes.

47. Plaintiff's slowdown of business was the result of physical loss or damage to ▮▮▮ property, namely the trayer, the air hose, and/or other parts of the ▮ equipment. Such physical loss or damage was caused by a "covered cause of loss," which includes all causes not expressly excluded by the Policy. As outlined below, Zurich cannot meet its burden of proof that the physical loss or damage to Supplier's equipment was caused by an excluded cause.

48. ▮▮▮'s property – equipment – was "of the type insurable" under the Zurich Policy, namely personal property.

49. ▮▮▮'s property was located at its ▮▮▮ facility (▮▮▮'s) facility (*see* Ex. A, Policy, App'x F, Loc. No. 1), a scheduled time element location on the Policy.

50. The amount of AMAG's time element loss and expense to reduce loss will be proven at trial.

51. The duration and amount of the Policy's Gross Earnings coverage and Extended Period of Liability coverage will be proven at trial.

### *ii.   The Policy's Extra Expense Coverage is Triggered*

52. AMAG's contingent business interruption also forced Plaintiff to incur expenses in excess of the total cost chargeable to the operation of its business over and above the total cost the Insured ordinarily would have incurred to conduct its business had no covered loss of or damage to ▮▮▮▮'s property and the resulting suspension of business occurred.

53. Such extra expenses include, without limitation the purchase of substitute product at a higher price and relabeling of vials.

54. The foregoing and any other similar expenses incurred by the Insured triggered the Policy's Extra Expense coverage.

55. The amount of the Policy's Extra Expense coverage will be proven at trial.

### *iii.   AMAG has or will incur Professional Fees Covered by the Policy*

56. The Policy also covers fees incurred by accountants, engineers and other professionals to determine, *inter alia*, the amount of covered loss. Ex. A, Policy, § 5.02.23.

57. The amount of AMAG's professional fees will be proven at trial.

### **The Contamination Exclusion Does Not Apply to This Claim**

58. Contrary to Zurich's denial of coverage, the Policy's Contamination exclusion is, by its terms, inapplicable to AMAG's loss. The unambiguous terms of the exclusion confirm that it does not apply to the facts presented here. Alternatively, to the extent there is ambiguity in Zurich's chosen language, it must be construed against Zurich and in favor of coverage. Zurich cannot prove (as it must to avoid coverage) any clear and unambiguous interpretation making the exclusion applicable.

59. Exclusion 3.03.01.01 provides: "This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy. . . . **Contamination**, and

any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

60. The Policy's definition of "Contamination (Contaminated)" provides:

> **Contamination (Contaminated)** – Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew.

Ex. A, Policy, § 7.09

61. This exclusion is inapplicable for a variety of reasons. First, it requires the "actual presence" of the foreign substance, presumably in Zurich's position, mold. ▮▮▮ and its consultants, however, only concluded that there was a "potential" for mold contamination. Moreover, there is no evidence that AMAG's ▮▮▮ product was "contaminated."

62. Indeed, the Policyholder is not seeking reimbursement for costs due to contamination, (*i.e.*, remediation costs) but rather for the Time Element losses caused by the physical loss of or damage to ▮▮▮'s property – the air hose, trayer, and/or equipment at the ▮▮▮ filling area. Such losses do not fall within the Contamination exclusion.

63. Second, even if Zurich could prove actual contamination, it could have only resulted from "direct physical loss or damage not excluded," such as damage to the air hose connection and trayer. To the extent mold was present under the trayer cabinet, it was localized and caused no loss until propelled by the leaking compressed air hose.

64. Because the Insured's "all-risk" policy drafted and issued by Zurich contains no provision excluding losses caused by the type of physical loss or damage described herein, the Insured reasonably expected that the Policy it purchased would cover these losses.

13

**No Other Cited Exclusions Apply to AMAG's Loss**

65. Contrary to Zurich's denial, the Policy's exclusions for faulty design and damage to stock in process are not applicable. These exclusions, provide:

> This Policy excludes the following but any resulting physical damage not otherwise excluded is insured:
>
> 3.03.04.01. Faulty, inadequate or defective design, specifications, workmanship, construction or materials used.
>
> 3.03.04.02. Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

66. There is no evidence of defective design of ▆'s trayer or other relevant equipment in the ▆ line, nor that any alleged defect caused the air hose leak. Moreover, any defect Zurich might hope to prove would not defeat coverage as "resulting physical damage not otherwise excluded *is insured*." Ex. A, Policy, § 3.03.04 (emphasis added).

67. AMAG's loss is not for damage to its material while being processed.

68. Accordingly, neither of these exclusions, nor any others in the Policy, limit or preclude coverage.

**COUNT ONE**
**Breach of Contract**

69. The Policyholder realleges and incorporates by reference the allegations of the foregoing paragraphs as if fully set forth herein.

70. The Policy constitutes a valid and enforceable contract between the Insured, on the one hand, and Zurich, on the other.

71. Plaintiff AMAG Pharmaceuticals, Inc. is an Insured under the Policy.

72.     On or about June 6, 2018, the Insured made a claim to Zurich under the Policy for substantial, multi-million-dollar losses covered by the Policy.

73.     Pursuant to the terms of the Policy, including the contingent business interruption, extra expense, gross earnings, expenses to reduce loss, and professional fees coverages, Zurich is obligated to provide coverage to the Insured, up to the respective limits of liability. AMAG's Claim is not excluded by any provision in the Policy.

74.     The Insured has complied with all applicable terms and conditions of the Policy that were not waived by Zurich or excused as a result of Zurich's denial of coverage or its breaches described herein. The Insured provided timely payment of premiums and timely notice of its Claim.

75.     Zurich has breached the Policy through its failure and refusal to provide coverage to the Insured.

76.     As a direct and proximate result of Zurich's breach, AMAG has been deprived of the benefit of its insurance coverage and has incurred damages in an amount to be proven at trial.

## COUNT TWO
### Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201; 2202

77.     The Policyholder realleges and incorporates by reference the allegations of the foregoing paragraphs as if fully set forth herein.

78.     Plaintiff AMAG is an Insured under the Policy, which is a valid and enforceable contract sold to the Insured by Zurich, and which provides up to $265,000,000 in coverage for property loss or damage, business interruption, extra expense, and other coverages, including up to $50,000,000 for contingent business interruption loss at ▮▮▮▮'s ▮▮▮▮▮▮▮▮▮▮ facility.

79. On or about June 6, 2018, the Insured gave Zurich timely notice of its Claim for contingent business interruption and other coverages, each of which involved a "Covered Cause of Loss" sufficient to trigger the Policy's Time Element Coverages (including Gross Earnings, Extended Period of Liability, and Extra Expense), expenses to reduce loss, and Professional Fees coverage, as well as any other coverages or benefits potentially available under the Policy.

80. On or about January 15 and March 30, 2021, Zurich wrongfully denied coverage for the Claim, erroneously contending that the Policy's contingent business interruption coverage was not triggered and that certain Policy exclusions purportedly preclude coverage for the Claim.

81. An actual and justiciable controversy exists between Zurich and the Insured concerning the application of the Policy to the Claim, including whether the Policy's coverage is triggered and whether certain exclusions apply.

82. The Insured seeks a declaration from the Court that: (a) loss or damage to [redacted]'s equipment was caused by a Covered Cause of Loss under the Policy, thus triggering the Policy's contingent business interruption coverage; (b) AMAG's time element losses for the period of indemnity and extended period of indemnity are covered under the Policy; (c) the Insured is entitled to coverage under the Policy's Time Element Coverages (including Gross Earnings, Extended Period of Liability, and Extra Expense) and expenses to reduce loss; (d) the Insured is entitled to coverage under the Policy's Professional Fees coverage; and (e) there is no applicable Policy exclusion or condition that precludes coverage for the Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment ordering the following relief:

A. Enter a judgment in favor of the Insured and against Zurich, as requested herein, on each of the Counts in this Complaint;

B. Award the Insured its actual and consequential damages sustained as a result of Zurich's breach of the Policy in an amount to be established through proof;

C. Enter a declaration that: (a) loss or damage to ▮▮▮'s equipment was caused by a Covered Cause of Loss under the Policy, thus triggering the Policy's contingent business interruption coverage; (b) AMAG's time element losses for the period of indemnity and extended period of indemnity are covered under the Policy; (c) the Insured is entitled to coverage under the Policy's Time Element Coverages (including Gross Earnings, Extended Period of Liability, and Extra Expense) and expenses to reduce loss; (d) the Insured is entitled to coverage under the Policy's Professional Fees coverage; and (e) there is no applicable Policy exclusion or condition that precludes coverage for the Claim;

D. Enter a judgment awarding the Insured pre-judgment interest and post-judgment interest under applicable law;

E. Enter a judgment awarding the Insured its attorneys' fees and costs as allowed by law; and

F. Such other and further relief to which Plaintiff may justly be entitled.

## **JURY DEMAND**

AMAG hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure as to all issues so triable.

Dated: April 13, 2021                                 Respectfully submitted,

By:  /s/ *James R. Anderson*
**PROSKAUER ROSE LLP**
James R. Anderson (BBO No: 693781)
One International Place
Boston, MA 02110
Phone: (617) 526-9851
Fax: (617) 526-9899
jaanderson@proskauer.com

Marc E. Rosenthal (*pro hac* motion pending)
70 West Madison, Suite 3800
Chicago, IL 60602
Phone: (312) 962-3530
Fax: (312) 962-3551
mrosenthal@proskauer.com